**UNITED STATES of America**

v.

**Walter David TATE.**

**Crim. A. No. 1324.**

United States District Court
D. Delaware.

Oct. 22, 1962.

Stanley C. Lowicki, Asst. U. S. Atty., Wilmington, Del., for the United States.

Victor F. Battaglia (of Theisen & Lank), Wilmington, Del., for defendant.

LAYTON, District Judge.

The defendant was tried and convicted of the offense of possessing an altered

(sawed-off) shotgun on which the federal tax had not been paid as required by 26 U.S.C. § 5821. After verdict, a timely motion for judgment of acquittal was made upon the ground that conviction was based on evidence obtained as the result of an illegal search and seizure contrary to the provisions of the Fourth Amendment to the federal Constitution.[1]

The facts are these. A Delaware State Highway Trooper on routine patrol observed defendant speeding along the highway at night. The officer overtook defendant after a 100 mile an hour chase, arrested him for speeding, and informed him that he would not be permitted to drive his own car to the police station. This decision apparently infuriated defendant, who offered resistance, and the trooper was forced to subdue him physically which he did by handcuffing him,

placing him on the front seat of the police car and shutting the door. The police officer, then feeling perfectly secure,[2] proceeded to search defendant's car. This search was, of course, conducted without a warrant. During the course of this search, the sawed-off shotgun forming the basis for this prosecution was discovered hidden under the front seat.

If it should be determined that it was unreasonable under the circumstances to search defendant's auto without a search warrant, the fruits of that search should have been excluded as evidence at the trial,[3] and the conviction must consequently fall.

Under certain conditions, a police search may take place without a warrant and still meet the standards of reasonableness imposed by the Fourth Amend-

1. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S.Const., amend. IV.

2. The trooper's own testimony is particularly positive and enlightening.
By Mr. Battaglia:
"Q. I believe you testified that you had completely subdued the defendant?
"A. That is correct.
"Q. You had both hands cuffed?
"A. That is correct.
"Q. Did you then take him back and put him in your vehicle?
"A. That is correct.
"Q. Was there another officer with you at that time?
"A. No, there wasn't.
"Q. Did you connect him in any way with your car so he couldn't get away, or was he just handcuffed?
"A. *I placed the defendant in my patrol car and shut the door. This was done to protect me personally. In other words, I would not begin to search that vehicle with him standing behind me even though he is handcuffed because police officers have lost their lives this way.*
"Q. Yes.

"A. *I placed the defendant in my patrol car, shut the door. Now, then, I began my search of that car. In order for him to get out of the car he has got to open the door. With his hands cuffed behind him, when I hear that door open I can be to that door of the car before he can be out of it.*
"Q. Exactly. Let me ask you another question. I believe you had testified that you had decided at this point that it would not be safe to have him drive his vehicle again, had you not?
"A. At this point? Before this.
"Q. Prior to this?
"A. Prior to this time.
"Q. So it was your intention he should not enter that vehicle again, was it not?
"A. It was my intention he was not to drive that vehicle from there because I had fear, of course, that he would attempt to flee from me with the use of that car.
"Q. You had prevented that; you had taken effective steps to prevent that, had you not?
"A. *Once I had him handcuffed I was positive he would not get away.*
"Q. All right. You placed him under arrest at that time, did you not?
"A. I placed the defendant under arrest immediately after receiving his license and registration on the very first approach." (Emphasis added.)

3. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

ment.[4]  One such circumstance is a search incident to a lawful arrest.

"The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody, is not to be doubted."  Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925).

The question presented here is the permissible extent and scope of a search, incident to a concededly lawful arrest, for the fruits of crime, the means of committing crime, or the weapons for possible escape from custody.  The judicial guidelines are by no means clear.  Indeed, the Supreme Court, speaking through Justice Frankfurter, said:

"We take as a starting point the cases in this Court dealing with the extent of the search which may properly be made without a warrant following a lawful arrest for crime.  The several cases on this subject in this Court cannot be satisfactorily reconciled.  This problem has, as is well-known, provoked strong and fluctuating differences of view on the Court.  This is not the occasion to attempt to reconcile all the decisions, or to re-examine them.  Compare Marron v. United States, 275 U.S. 192 [48 S.Ct. 74, 72 L.Ed. 231], with Go-Bart [Importing] Co. v. United States, 282 U.S. 344 [51 S.Ct. 153, 75 L.Ed. 374], and United States v. Lefkowitz, 285 U.S. 452 [52 S.Ct. 420, 76 L.Ed. 877]; compare Go-Bart, supra, and Lefkowitz, supra, with Harris v. United States, 331 U. S. 145 [67 S.Ct. 1098, 91 L.Ed. 1399], and United States v. Rabino-

witz, 339 U.S. 56 [70 S.Ct. 430, 94 L.Ed. 653]; compare also Harris, supra, with Trupiano v. United States, 334 U.S. 699 [68 S.Ct. 1229, 92 L.Ed. 1663], and Trupiano with Rabinowitz, supra (overruling Trupiano).  Of these cases, Harris and Rabinowitz set by far the most permissive limits upon searches incidental to lawful arrests."  Abel v. United States, 362 U.S. 217, 80 S. Ct. 683, 4 L.Ed.2d 668 (1960).

In the Harris case, the defendant was lawfully arrested for mail fraud in the living-room of his four-room apartment.  Harris was handcuffed and the officers, without a warrant, searched his entire apartment for two cancelled checks, the means by which the mail fraud was thought to have been accomplished.  After five hours, an envelope containing Harris' personal papers was found in his bedroom bureau.  This envelope contained altered draft cards and formed the basis of a conviction under the Selective Service Act.  The Supreme Court held that a search which extends to areas under the "immediate control" of the person arrested is reasonable and thus constitutional.  Harris v. United States, supra, 331 U.S. at 151, 67 S.Ct. 1098, 91 L.Ed. 1399.  The entire apartment was considered to be under Harris' immediate control, even though he was confined to one room.  Moreover, it was not considered significant that the draft cards which were seized were not related to the crime for which Harris was arrested or to the purpose of the search.  Id. at 154, 67 S.Ct. 1098, 91 L.Ed. 1399.

"Immediate control" was, likewise, the constitutional test applied in Rabinowitz, supra, which upheld a search, without a warrant, of a one-room business office.

■  At first blush it would appear that Harris and Rabinowitz constitute authority to sustain the search that took place in the instant case.  "Immediate;

4.  E. g., in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), a search of an automobile, without a warrant, survived constitutional attack where there was probable cause to believe it was carrying contraband alcohol.

control" must mean some less degree of dominion than actual physical control of the object seized, because the person arrested in Harris was handcuffed in the living-room while his bedroom was searched. Nor can it be said that the defendant in the instant case had any less constructive control over his auto than Harris had over his bedroom. Furthermore, the five hour, five-man search of the defendant's living quarters upheld in Harris was certainly more offensive to the right of privacy embedded in the Fourth Amendment than was the rapid search of the defendant's auto here. However, there is a common thread running through all cases upholding a search without a warrant which is lacking here. The searcher must have in mind some reasonably specific thing he is looking for and reasonable grounds to believe it is in the place being searched.[5] General exploratory searches are not tolerated. Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 75 L. Ed. 374 (1931).

■ The record in this case lacks any indication of what the trooper was looking for in Tate's automobile. Quite obviously, he could not have been looking for the fruits of the crime for which Tate was arrested—there are no fruits of speeding. He certainly could not have been searching under the car seat for the means by which the crime was committed—the whole automobile itself was the means. He was not looking for forfeited property such as a sawed-off shotgun, which he had no means of knowing about, and the mere fact that such property unexpectedly turned up does not render the search valid. Byars v. United States, 273 U.S. 28, 29, 47 S.Ct. 248, 71 L.Ed. 520 (1927). There was no general police alarm being broadcast for a person of defendant's description, nor did the trooper upon arresting defendant recognize him as a person with a long criminal record.

The government contends that the search can be justified as a search for weapons of escape from custody. This argument is difficult to accept either factually or legally. There is no direct testimony in the record that the trooper was looking for a weapon, either legal or illegal, in Tate's auto, or that he even suspected the existence of one. Moreover, the surrounding circumstances do not lead me to infer that such was the purpose of the search. The trooper testified that he handcuffed and placed the defendant in the patrol car for his own (the trooper's) protection. Once this was done, he was positive he could not escape and get at any weapon or weapons concealed in his own automobile.[6] I can only conclude, therefore, that this search was for the purpose of a general exploration for whatever might turn up.

■■ While it cannot be denied that a search for weapons which may be used to assault the arresting officer or to effect an escape may be necessary in many or most instances, and conceding that great deference should be paid to an officer's decision that a search for weapons is necessary, nevertheless, to consider all searches for weapons incidental to an arrest as reasonable *per se* would permit wholesale fishing expeditions whenever a legal arrest is made. Without drawing the legal limit of a search for weapons contemporaneous with an arrest, I hold that the facts of this case render the search unreasonable and unconstitutional, since the reasons supporting this exemption from obtaining a warrant seem to have been totally lacking. This is not to say, however, that the officer in question, not trained in the law, should necessarily be criticized for doing his duty as he saw it. In a close case such as this, it is perhaps better that the ar-

5. Carroll v. United States, supra note 4; Harris v. United States, supra 331 U.S. at 153, 67 S.Ct. 1098, 91 L.Ed. 1399; Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Rabinowitz v. United States, supra 339 U.S. at 62, 70 S.Ct. 430, 94 L.Ed. 653; Abel v. United States, supra 362 U.S. at 237, 80 S.Ct. 683, 4 L.Ed.2d 668.

6. See the trooper's testimony, supra note 2.

resting officer be overzealous and, in finding a deadly weapon, thus prevent some brutal intended crime such as murder, leaving it to trained prosecuting authorities to determine at leisure whether the facts warrant prosecution for the offense thus uncovered.

Motion for judgment of acquittal granted.